# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-1550V

|  |  |
|---|---|
| H.F.,<br><br>                     Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                     Respondent. | Chief Special Master Corcoran<br><br>Filed: March 19, 2025 |

*Ronald Craig Homer, Conway, Homer, P.C., Boston, MA,* for Petitioner.

*Alexis B. Babcock, U.S. Department of Justice, Washington, DC,* for Respondent.

## DECISION AWARDING DAMAGES[1]

On October 4, 2019, H.F. filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered a shoulder injury related to vaccine administration ("SIRVA"), which meets the Table definition for SIRVA, or, in the alternative, was caused by the influenza vaccine he received on October 13, 2016. Petition at 1, ¶¶ 1-3. Respondent conceded entitlement, but the parties were unable to resolve damages on their own,[3] so I ordered briefing on the matter.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Approximately six months after I determined Petitioner was entitled to compensation, the parties informed me that they had reached an impasse in their damages discussions and requested that I set a briefing schedule. Status Report, filed Feb. 18, 2022, ECF No. 68.
.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$175,416.58**, **representing $170,000.00 for actual pain and suffering, plus** $5,416.58 **for past unreimbursable expenses.**

## I.   Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## II.     Prior SIRVA Compensation Within SPU[4]

### A.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2025, 4,545 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,397), with the remaining 148 cases dismissed.

2,506 of the compensated SPU SIRVA cases were the result of a ruling that the petitioner was entitled to compensation (as opposed to an informal settlement), and therefore reflect full compensation.[5] In only 270 of these cases, however, was the amount of damages determined by a special master in a reasoned decision.[6] As I have previously

---

[4] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[5] The remaining 1,891 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[6] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,206 cases) or stipulation (30 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[7]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[8] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *270* | *2,206* | *30* | *1,891* |
| **Lowest** | $30,000.00 | $5,000.00 | $45,000.00 | $1,500.00 |
| **1st Quartile** | $67,305.16 | $60,000.00 | $90,000.00 | $32,500.00 |
| **Median** | **$89,500.00** | **$80,000.00** | **$122,866.42** | **$50,000.00** |
| **3rd Quartile** | $125,000.00 | $107,987.07 | $162,000.60 | $75,000.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 270 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $30,000.00 to $215,000.00, with $87,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[9] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[10]

---

[7] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[8] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[9] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[10] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

4

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In nine cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### III. Relevant Medical History

Prior to vaccination, Petitioner suffered from lower back pain (described as knife-like and aching when sitting) since at least 2014. Ex. 2 at 6. In the record from an April 24, 2014 primary care provider ("PCP") visit, it was noted that a recent MRI showed "where his inverted disc [wa]s impinging his verve (left paracentral L5-S1)" and a note from his PCP suggesting Petitioner should contact pain management. *Id.* at 21; *see id.* at 26-27 (MRI results). Throughout 2014, Petitioner sought treatment for this condition, receiving oral steroids and attending PT. *E.g., id.* at 28, 32, 45-46, 54-55; Ex. 24 (October 2014 PT visit). And it was listed as an ongoing problem, along with insomnia and herpes zoster, when Petitioner first complained of left arm pain in November 2016. Ex. 2 at 61-62.

Petitioner, a 40-year-old attorney, received the flu vaccine alleged as causal on October 13, 2016. Ex. 2 at 3. Approximately one month later, he visited his PCP

5

complaining of swelling, limited mobility, and a constant ache which made sleep difficult which he attributed to the flu vaccine. Ex. 2 at 61. At a follow-up appointment one week later, the PCP discussed the need for an MRI and physical therapy PT. *Id.* at 67. That MRI (performed on January 9, 2017) showed only "marrow changes of the humeral head most likely degenerative in origin," but no rotator cuff issues or evidence of bursitis. Ex. 9 at 2.

Approximately two months later, Petitioner began to experience additional symptoms – numbness and tingling. During a January 26, 2017 visit to a neurologist, he complained of continued pain with all arm movements, now accompanied by "a distracting abnormal sensation traveling down the arm." Ex. 10 at 14. He again attributed his symptoms to the flu vaccine, stating that it "appeared to be given very high in the shoulder." *Id.* Opining that Petitioner was suffering from adhesive capsulitis of the left shoulder joint causing secondary numbness/tingling in the left arm," the neurologist ordered an EMG and referred Petitioner to an orthopedist. *Id.* at 15.

After undergoing the EMG, the results of which were normal (Ex. 16 at 10), Petitioner sought treatment from Dr. Huffman on February 17, 2017. Ex. 2 at 91-96. Noting the poor quality of Petitioner's MRI,[11] which he believed showed some fluid around the rotator cuff indicative of bursitis, Dr. Huffman administered a steroid injection and ordered PT. *Id.* at 91-92.

At his first PT session on February 24, 2017, Petitioner reported some relief from the steroid injection, rating his current pain as five – ranging from five to ten at the worst. Ex. 4 at 12. He continued to show improvement in pain, tingling, and ROM during PT sessions from late February through April 2017.[12] *E.g.,* Ex. 4 at 24, 37, 59, 64-65, 70, 92, 103, 107, 113, 118. Thoracic outlet syndrome ("TOS") was added to Petitioner's list of diagnoses in the record from a PT session on March 30, 2017. Ex. 4 at 85. In his signed declaration, Petitioner stated that his physical therapist diagnosed him with this condition. Ex. 26 at ¶ 23.

In late April and May 2017, Petitioner began to experience more serious setbacks during PT. *E.g.,* Ex. 4 at 124, 129, 133, 139. Noted to have reached a plateau, and having gained maximum improvement, he was discharge from PT on May 23, 2017, following a total of 27 sessions. *Id.* at 155.

---

[11] In his declaration, signed under penalty of perjury as required by 28 U.S.C.A. § 1746, Petitioner complained that the staff taking the MRI were disorganized and made many mistakes when completing the paperwork. Ex. 26 at ¶ 15.

[12] Petitioner experienced a slight pain increase in early April 2017, but attributed it to a second steroid injection administered by Dr. Huffman the previous day. *Id.* at 98 (April 8, 2017 PT session); *see* Ex. 2 at 101 (April 7, 2017 orthopedic visit).

6

At a follow-up appointment on May 25, 2017, Dr. Huffman noted that PT "has helped alleviate the thoracic outlet symptomatology . . . [and][h]e has also regained his motion, however, he continues to have pain anterolaterally in the region of the subacromial subdeltoid bursa." Ex. 2 at 111. Dr. Huffman ordered a repeat MRI due to the poor quality of the previous one. *Id.* Performed on June 1, 2017, the MRI revealed early tendinosis of the supraspinatus and trace fluid in the subacromial/subdeltoid bursa that "may be related to underlying mild bursitis." Ex. 16 at 14.

At Petitioner's next orthopedic visit on June 8, 2017, Dr. Huffman noted that the MRI showed some labral abnormality. Ex. 2 at 115. He administered another steroid injection – this time in the glenohumeral joint. *Id.* at 116. In August 2017, Petitioner sought a second opinion from another orthopedic surgeon who recommended surgery. Ex. 7 at 15. Dr. Huffman agreed (Ex. 2 at 125-126) and performed an extensive left shoulder debridement on September 20, 2017.[13] Ex. 15 at 15-16. During surgery, Dr. Huffman observed a small amount of labrum fraying, type 1 superior labrum tear, small adhesions present in the glenohumeral joint, and thick and abundant adhesions in the subacromial space. *Id.* at 15.

At his first post-surgical orthopedic visit on September 27, 2017, Petitioner's listed diagnoses were left shoulder biceps tendonitis, bursitis, and superior glenoid labrum lesion. Ex. 2 at 134. The physician's assistant who saw Petitioner ordered PT and additional oxycodone. *Id.* at 137.

Approximately three weeks later, on October 18, 2017, Petitioner attended his first post-surgical PT session, reporting pain that ranged from four to nine, currently at six. Ex. 4 at 173. He reported a similar pain level (five) at his next orthopedic visit two days later. Ex. 2 at 148. Confirming that he was attending PT, Petitioner stated that "[h]is shoulder is feeling well and his is gaining a lot of motion." *Id.* at 127. Although Petitioner denied any numbness and tingling (*id.* at 147), TOS was added to his list of diagnoses (*id.* at 142). He was prescribed Gabapentin and told to continue PT. *Id.* at 149.

By his thirteenth PT session on January 13, 2018, Petitioner reported being happy with his progress, but still having some pain when sleeping. Ex, 4 at 242. His current pain level was three, ranging from two to seven. *Id.* At his orthopedic visit on February 2, 2018, Dr. Huffman observed that Petitioner "has close to full range of motion now." Ex. 2 at 181.

---

[13] Although Dr. Huffman originally thought a biceps tenodesis might be required, it was not performed *See* Ex. 2 at 125. "Biceps tenodesis is done by detaching your biceps tendon from your labrum and moving the tendon to your upper arm bone (humerus)." https://my.clevelandclinic.org/health/treatments/21926-biceps-tenodesis (last visited Mar. 17, 2025). It is used to "treat[] biceps tendon tears caused by injury or overuse . . . [and] SLAP tears — tears in your labrum." *Id.*

Predicting that Petitioner "will continue to make progress," he opined that his condition "seems to be fairly clear evidence of a SIRVA type of reaction." *Id.*

At PT sessions in March and April 2018, Petitioner continued to report milder pain – at a level of three. *E.g.,* Ex. 4 at 310. During his next orthopedic visit on May 4, 2018, Dr. Huffman noted that Petitioner "has very close to full range of motion [but] a little bit of a reactivity in his subacromial space." Ex. 2 at 188. He assessed Petitioner as "doing as well as he has been since I met him." *Id.* Dr. Huffman administered a subacromial corticosteroid injection and prescribed additional Gabapentin. *Id.* at 187-89.

During his next orthopedic appointment on August 3, 2018, Dr. Huffman noted that Petitioner's SIRVA-related symptoms were much better, but that Petitioner "still has limitations in motion." Ex. 2 at 194. Petitioner stated that he continued to take Gabapentin and "has started having more constant numbness and tingling in the ulnar nerve distribution." *Id.* In response, Dr. Huffman ordered an EMG.

After Petitioner's EMG results were normal, Dr. Huffman instructed him to return to PT. Ex. 2 at 200. He added that the next steps thereafter would be a brachial plexus MRI and referral to a colleague who specialized in TOS. *Id.*

Although Petitioner's current pain level had decreased to two by June 2018 (Ex. 4 at 354), he again reported a moderate level (five) at his 38th and last PT session on September 15, 2018 (*id.* at 383). His symptoms were described as "[p]ain, weakness, [and] [p]oor [e]ndurance." *Id.* When Dr. Huffman saw Petitioner six days later, he provided a recap of Petitioner's "myriad of symptoms" which included "intermittent episodes of thoracic outlet syndrome." Ex. 2 at 208. Dr. Huffman added that Petitioner "was doing well from the standpoint of getting all of his shoulder motion back, having relief of the pain that he had in his shoulder and upper arm and started developing more issues with both vascular and neurogenic thoracic outlet syndrome." *Id.* He ordered an MRI of Petitioner's left brachial plexus and recommended that Petitioner pursue treatment with two specialists, Drs. Zager and Chou. *Id.*

The subsequent MRI (performed on October 1, 2018) showed "[n]o discrete mass in the left brachial plexus. Ex. 11 at 11. In a signed declaration, he stated that he attempted to schedule an appointment with Dr. Chou but was told he was not taking new consultations for several months and would not accept Petitioner's medical insurance. Ex. 26 at ¶ 46. Instead, Petitioner shared his concerns and frustration regarding his TOS and left shoulder pain with his PCP during a physical on October 19, 2018. Ex. 2 at 215. The PCP noted that he would seek additional information regarding Petitioner's TOS from a specialist. *Id.* at 217.

8

On December 12, 2018, Petitioner began PT at a different clinic (Apple PT) upon a referral from Dr. Huffman. Ex. 5 at 8. He complained of "numbness/tingling pain into his L hand and pain in [his] shoulder post shoulder surgery." *Id.* He estimated that his pain ranged from four to six, currently at five. *Id.* By his eighth PT session on February 13, 2019, Petitioner was assessed as "continu[ing] to respond well to treatment, feeling less frequent and intense pain into his L arm/hand." *Id.* 20.

On February 11, 2019, Petitioner visited the Princeton Spine & Joint Center – a clinic he had found from an internet search. Ex. 6 at 3. Recounting his history of left shoulder pain, Petitioner noted that "[a]t some point, he began to devop [sic] paresthesias in hsis left arm, forearm, and fourth and fifth fingers." *Id.* at 4. He reported that currently he "has intermittent associated paresthesias into left hand" and was taking Gabapentin. *Id.* Upon examination, he was observed to have cervical tenderness - greater on the left than right, "positive L trapezius trigger point palpated with characteristic referral pain pattern," and decreased ROM. *Id.* at 5. Petitioner was administered the first in a series of three treatments, involving an ultrasound guided left suprascapular nerve block and intra-articular hyaluronic acid viscosupplementation injection. *Id.* at 7-8. He received two more treatments in late February 2019. *Id.* at 9-12.

Petitioner completed his last PT session at Apple PT (the ninth) on February 27, 2019. Ex. 5 at 22. And he underwent another EMG the next day which "reveal[ed] evidence of mildly increased cervical paraspinal muscle activity, which may reflect underlying cervical radiculopathy [and] no definitive electrophysiologic evidence of associated focal neuropathy, brachial plexopathy, or myopathy at this time." Ex. 18 at 7. In late August and September 2019, Petitioner underwent another three treatments at Princeton Spine & Joint Center. Ex. 6 at 13-18.

On October 16, 2019, Petitioner began PT at another clinic, Strive PT. Ex. 23 at 6. At his initial evaluation, Petitioner described a three- to four-year history of left shoulder symptoms that started with the October 2016 flu vaccine and included a labral tear and several TOS flares. *Id.* At his January 20, 2020 reevaluation, he reported that his left shoulder felt stronger and more flexible, although he still felt "less motion at extreme ranges compared to right and it still does fatigue quicker than right." *Id.* at 29. His symptoms were described as "currently getting better" at his last (and 17th) PT session on March 9, 2020. *Id.* at 23. In his signed declaration, Petitioner stated that he stopped PT due to the worldwide COVID Pandemic. Ex. 26 at ¶ 65.

On June 23, 2020, Petitioner called his PCP, seeking Gabapentin and Naproxen. Ex. 22 at 9. Three days later, he described his symptoms, success with injection at Princeton Spine & Joint Center, and concerns regarding his parent's health and COVID at a telemedicine appointment with his PCP. *Id.* at 23. The PCP prescribed Gabapentin

9

and Naproxen. *Id.* at 24. He continued to receive injections from Princeton Spine & Joint Center in March 2022, October 2022, February 2024, and June 2023, and October/November 2024, and to seek treatment from his PCP. Exs. 27, 43, 45, 57-58 (Princeton Spine & Joint Center records); Ex. 44 (PCP records).

## IV. The Parties' Arguments

### A. Briefing

The parties dispute the extent of Petitioner's SIRVA-related sequela in this case. Disagreeing with Respondent's assertion that Petitioner's TOS is unrelated to his SIRVA, Petitioner maintains "that all symptomology in [his] left upper extremity, including pain, limited range of motion, weakness, numbness and tingling began with his October 13, 2016 flu vaccine and can be attributed to his SIRVA and/or treatment for his SIRVA." Petitioner's Memorandum in Support of Damages ("Brief"), filed Sept. 27, 2022, at 41, ECF No. 86 (citing Respondent's Rule 4(c) Report at 10 n.3). The parties have provided expert reports to support their positions which will be discussed further in Section III.B. *See* Ex. 29, filed Sept. 14, 2022, ECF No. 79-1; Ex. A, filed Jan. 31, 2023, ECF No. 87-1; Ex. 46, filed Aug. 8, 2023, ECF No. 97-1.

Petitioner seeks a net present value of $210,000.00 for his past and future pain and suffering. Brief at 53. He emphasizes his prior good health and vigorous fitness routine; negative side effects of treatment; effect on his sleep, family life, and work; and overall SIRVA duration – which he asserts is more than six years. *Id.* at 44-50. Petitioner favorably compares the facts and circumstances in his case to those suffered by the petitioners in *S.C., Tumolo,* and *Reed*[14] – decisions featuring one arthroscopic surgery and past pain and suffering awards of $160,000.00; and *Pruitt, McDorman,* and *M.W.*[15] - decisions featuring two arthroscopic surgeries and past pain and suffering awards ranging from $185,000.00 to $200,000.00. Brief at 49-52. Claiming that "the duration and extent of [his] injury exceeds even that of two-surgery cases," Petitioner cites *Elmakky* and *Welch,*[16] - two additional cases involving three arthroscopic surgeries each and awards

---

[14] *S.C. v. Sec'y of Health & Hum. Servs.,* No. 19-0341V, 2021 WL 2949763 (Fed. Cl. Spec. Mstr. June 14, 2021); *Tumolo v. Sec'y of Health & Hum. Servs.,* No. 16-0343V, 2020 WL 6279711 (Fed. Cl. Spec. Mstr. Oct. 1, 2020); *Reed v. Sec'y of Health & Hum. Servs.,* No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019).

[15] *Pruitt v. Sec'y of Health & Hum. Servs.,* No. 17-0757V, 2021 WL 5292022 (Fed. Cl. Spec. Mstr. Oct. 29, 2021) (awarding $185,000.00 for past pain and suffering); *McDorman v. Sec'y of Health & Hum. Servs.,* No. 19-0814V, 2021 WL 5504698 (Fed. Cl. Spec. Mstr. Oct. 18, 2021) (awarding $200,000.00 for past pain and suffering); *M.W. v. Sec'y of Health & Hum. Servs.,* No. 18-0267V, 2021 WL 3618177 (Fed. Cl. Spec. Mstr. Mar. 17, 2021) (awarding $195,000.00 for past pain and suffering).

[16] *Elmakky v. Sec'y of Health & Hum. Servs.,* No. 17-2032V, 2021 WL 6285619 (Fed. Cl. Spec. Mstr. Dec. 3, 2021) (awarding $205,000.00 for past pain and suffering); *Welch v. Sec'y of Health & Hum. Servs.,* No.

of $205,000.00 and $210,000.00, respectively. Brief at 52, 52 n.11.

Petitioner also requests $11,600.47 for past expenses, and $2,781.72 per year for future expenses. Brief at 53. The provided list of past expenses shows $11,112.62 for co-pays for medical visits and prescription medication and mileage costs of $487.85. Exs. 41-42, Sept. 27, 2022, ECF No 84. The requested future expenses are to cover the cost of ultrasound guided suprascapular nerve blocks and ultrasound guided intra-articular hyaluronic acid viscosupplementation injections every six months until 65 years old. Brief at 34-36. Petitioner bases his cost calculation for these injections, administered in a series of three twice a year, on $463.62 per injection, representing the $100.00 co-payment and $363.62 for a portion of his current insurance deductible ($2,500.00). *Id.* at 36.

Respondent counters that Petitioner should be awarded $110,000.00 for past pain and suffering. Respondent's Brief in Support of Damages ("Opp."), filed Jan. 31, 2023, at 20, ECF No. 88. Emphasizing the improvements Petitioner reported in August 2018, and differing symptoms thereafter (*id.* at 19-20), he argues that "the analysis on pain and suffering should center on [P]etitioner's treatments for his SIRVA during the immediate two-year period following his vaccination" (*id.*). As comparable cases, Respondent proposes *Shelton, Felland,* and *Guymon,*[17] featuring awards ranging from $97,500.00 to $110,000.00. Opp. at 20-22. Regarding Petitioner's assertion that his case is similar to cases involving multiple arthroscopic surgeries – specifically *Elmakky*, he notes that such a comparison would necessitate the inclusion of the symptoms related to TOS, suffered after August 2018. *Id.* at 22-23.

Regarding Petitioner's expenses, Respondent argues that only the expenses related to his SIRVA – paid prior to August 3, 2018 ($5,416.58), should be reimbursed. Opp. at 23. He maintains that most of the remaining past expenses ($4,521.41), as well as all amounts sought for future expenses are related to Petitioner's TOS, which has not been shown to be vaccine caused. *Id.* at 23-25. The remaining deduction to past expenses ($1,662.48) is due to Respondent's inability to find corresponding medical or billing records for eight entries (one of which appears to be a duplication) or a medical recommendation for a shoulder brace purchase from Amazon. *Id.* at 24. Respondent adds that even if I find his TOS to be SIRVA-related, Petitioner has not provided sufficient evidence to show that the VISCO Injections and nerve blocks Petitioner plans to undergo

---

18-0074V, 2021 WL 1795205 (Fed. Cl. Spec. Mstr. Apr. 5, 2021) (awarding $210,000.00 for past pain and suffering).

[17] *Shelton v. Sec'y of Health & Hum. Servs.,* No. 19-0297V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 202)1(awarding $97,500.00 for past pain and suffering); *Felland v. Sec'y of Health & Hum. Servs.,* No. 20-0406V, 2022 WL 10724100 (Fed. Cl. Spec. Mstr. Sept. 6, 2022) (awarding $100,000.00 for past pain and suffering); *Guymon v. Sec'y of Health & Hum. Servs.,* No. 19-1411V, 2022 WL 1447006 (Fed. Cl. Spec. Mstr. Mar. 25, 2022) (awarding $110,000.00 for past pain and suffering).

11

in the future are reasonably necessary. *Id.* at 24-25.

Noting that surgery does not always result in a resolution of SIRVA symptoms, Petitioner disputes Respondent's assertion that his symptoms did not extend beyond August 3, 2018. Petitioner's Damages Reply Brief ("Reply"), filed Aug. 10, 2023, at 4, ECF No. 107. He cites his orthopedist's observation that his symptoms had improved, but not resolved at that time, and that the numbness and tingling he was experiencing supplemented, rather than replaced, his prior SIRVA symptoms. *Id.* at 4-5. He also emphasizes a March 2022 statement from the doctor administrating Petitioner's ongoing injections, describing his past history and opining that the injections are needed every six months for Petitioner's chronic pain. *Id.* at 7 (quoting Ex. 7 at 3). Respondent insists that this evidence establishes that his symptoms of TOS are SIRVA-related sequela. *Id.* at 9-14. Arguing that the comparable cases cited by Respondent "are vastly dissimilar" (*id.* at 20), Petitioner reiterates his assertion that his facts and circumstances should be favorably compared to SIRVA cases involving multiple surgeries (*id.* at 21-23).

Regarding expenses, Petitioner agrees that the past amount should be decreased by $127.18, a duplicative amount which was mistakenly included. Reply at 28. Adding further costs which have been expended, he now seeks $14,376.32 for past expenses (including mileage costs). *Id.* Regarding future expenses, he reiterates his request for $2,781.32 per year until age 65, insisting that this treatment is effective and necessary. *Id.* 20-31.

On January 16, 2025, Petitioner filed supplemental briefing, updating his past expenses to account for additional expenditures from 2022 and 2023. Petitioner's Supplemental Memorandum in Support of Damages ("2nd Reply") at 2-4, 7, ECF No. 113. He now seeks $16,885.69 for past expenses and the same amount yearly amount for future expenses. *Id.* at 7.

### B. Expert Reports

On September 14, 2022, Petitioner filed an expert report and curriculum vitae ("CV") from G. Russell Huffman, MD, MPH,[18] the orthopedic surgeon who treated Petitioner, and performed his September 20, 2017 surgery. Exs. 29-30, ECF No. 79. Dr. Huffman first opined that Petitioner's "diagnoses of bursitis, biceps and rotator cuff inflammation and adhesive capsulitis all fit the with the reported criteria for SIRVA and vaccine causality." Ex. 29 at 4. Asserting that "[b]oth thoracic outlet syndrome and adhesive capsulitis are independently associated with adverse vaccination reactions" (*id.* at 4), he concluded that further adhesive capsulitis and later diagnoses of biceps

---

[18] MPH stands for Master of Public Health.

tendonitis and TOS were also vaccine caused. *Id.* at 5. Although he stated that Petitioner's TOS "could be a direct result of the vaccination occurring concurrent to his SIRVA," Dr. Huffman opined that "it is more likely that he developed thoracic outlet syndrome secondary to his acute SIRVA, which was secondarily reinforced by his adhesive capsulitis and ongoing symptoms." *Id.* at 6. To support his opinion, Dr Huffman provided medical literature regarding autoimmune reactions generally, SIRVA, adhesive capsulitis, Parsonage-Turner syndrome, brachial neuritis, and a VAERS[19] report of limb swelling post-vaccination. Exs. 31-39, ECF No. 80.

Regarding the treatment that Petitioner has received, Dr. Huffman concluded that "[i]t is also my opinion that the treatment that [Petitioner] has undergone has been reasonable, medically necessary and related to the sequelae of the vaccination reaction. Ex. 29 at 6. He stated that Petitioner "continues to suffer from sequelae of the vaccination to this date." *Id.*

On January 31, 2023, Respondent provided an expert report and CV from Dr. Paul J. Cagle, an orthopedic surgeon. Exs. A-B, ECF No. 87. Pointing to multiple differences between SIRVA and TOS, Dr. Cagle criticized Dr. Huffman's assertion "that TOS is independently associated with adverse vaccination events." Ex. A at 3. He also questioned Petitioner's TOS diagnosis, observing that it "is not a diagnosis of exclusion . . . [and] there needs to be clear evidence of a physical anomaly that can be corrected." *Id.* Observing that none of the medical literature Dr. Huffman provides mentions TOS, and most discuss conditions not found in this case, he asserted that "none . . . support the assertion that TOS correlated with a SIRVA In this case." *Id.* In addition to the delayed timing for Petitioner's TOS symptoms, Dr. Cagle emphasized that "a viable mechanism for how a [SIRVA] caused a delayed presentation of TOS is unsupported by the medical record, the published literature regarding SIRVA and the report by Dr. Huffman." *Id.* Instead, he opined that Petitioner's TOS "is unrelated to vaccination." *Id.* at 4. To support his opinion, Dr Cagle cited an article regarding SIRVAs that he wrote, and an article regarding TOS. Exs. A1, A2.

Dr. Cagle also questioned the need for long-term injections that Petitioner believes are needed. Ex. A at 4. Insisting instead that common treatments for musculoskeletal conditions are more normally needed only short-term, Dr. Cagle argued that "[a]ny suggestions that a treatment like injections would be absolutely needed over the course of years or even decades is well outside the bounds of reasonable medical advice." *Id.*

---

[19] "Established in 1990, the Vaccine Adverse Event Reporting System (VAERS) is a national early warning system to detect possible safety problems in U.S.-licensed vaccines. . . . [It] accepts and analyzes reports of adverse events (possible side effects) after a person has received a vaccination. Anyone can report an adverse event to VAERS." https://vaers.hhs.gov/about.html (last visited on Mar. 18, 2025).

In a supplemental report filed on August 8, 2023, Dr. Huffman reiterated his original opinion that "the vaccine is causally related to the TOS symptoms experienced by [Petitioner]." Ex. 46 at 3. Discussing his extensive experience relate to TOS and the difficulty diagnosing this condition (*id.* at 2-3), He described a process by which "[c]ompression of the lower trunk of the brachial plexus (involving the ulnar nerve) can occur" at the pectoralis minor[20] - a condition that often fails to produce positive EMG results (*id.* at 2).

### V. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole, including the filed medical records, affidavits, and sworn declarations and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

A thorough review of the medical records reveals that Petitioner suffered a moderate SIRVA injury, with pain levels estimated at five, some limited ROM, and accompanying tingling and numbness that began approximately two months post-vaccination. He obtained some relief during the first seven months of his SIRVA from two steroid injections and 27 PT sessions, but reached a plateau in May 2017. A diagnosis of TOS was added to his PT records by his therapist in late-March 2017.

After undergoing arthroscopic surgery, consisting of extensive debridement in September 2017, Petitioner made good improvement during the subsequent eleven months, benefiting after 38 PT sessions and another steroid injection. He reported pain at a level of two out of ten in June 2018, and mild limitations in ROM in August 2018.

However, Petitioner also began to experience increased numbness and tingling down his arm and into his hand. He later complained of a feeling of coldness. At his last appointment with Dr. Huffman in September 2018, Petitioner was referred to two TOS experts. After encountering some difficulty scheduling an immediate appointment, he opted to rely upon his PCP and injections administered up to twice a year at Princeton

---

[20] Pectoralis minor is the smaller muscle under the pectoralis major, extending from the third to fifth ribs to the scapula. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1192 (32th ed. 2012).

Spine & Joint Center.

Like most SIRVA cases, some of Petitioner's shoulder issues were likely present prior to vaccination, but asymptomatic until aggravated by an improperly-injected vaccine. As usual, it is difficult to differentiate between the impact of the vaccine mis-administration and its effect on preexisting but asymptomatic problems. Due to their location, conditions such as the type 1 labrum tear observed during surgery are not likely to have been directly affected by a vaccination – regardless of how administered. But Petitioner clearly experienced some vaccine-related symptoms, and Respondent concedes that point.

It is also difficult to determine whether the symptoms Petitioner experienced after August 2018, were related to Petitioner's SIRVA. The lack of an obvious alternate cause for these symptoms,[21] as well as the opinion of Petitioner's treating orthopedic surgeon, Dr. Huffman weigh in Petitioner's favor. However, Petitioner was never seen by the TOS experts Dr. Huffman recommended. And it appears he did not return to Dr. Huffman for further treatment after his September 2018 visit, which occurred less than two years post-vaccination and more than four years prior to the filing of Dr. Huffman's expert report. As Respondent's expert noted, there is a lack of evidence in the record as it currently stands supporting the TOS diagnosis and its potential causes.

In his expert report, Dr. Huffman theorizes that the numbness and tingling Petitioner began to experience in January 2017, was due to his limited ROM and pressure applied to his pectoralis minor, and that appears to be a logical explanation for those earlier, fairly mild symptoms. However, it would not account for the symptoms Petitioner described post-surgery, which continued to increase in severity during 2018, even as the symptoms which were clearly vaccine-related (shoulder pain and limitations in ROM) improved. And testing revealed that Petitioner experienced some conditions – specifically the labrum tear, not likely to have been caused or aggravated by the vaccine he received.

In addition to the lack of evidence showing a causal link between Petitioner's later symptoms and his earlier SIRVA, there is insufficient evidence to support Dr. Huffman's assertion that, in general, TOS has been shown to be vaccine-related. The medical literature he cites does not address the matter. And he has provided no other evidence to support this claim.

Although I find there is not sufficient evidence to link most of Petitioner's later symptoms to his SIRVA, he may have continued to experience some mild limitations and pain from the damage done by the improperly administered flu vaccine which I will take into account when determining pain and suffering. Thus, he is entitled to a pain and

---

[21] Petitioner did suffer from lower back pain prior to vaccination, but neither expert theorizes that could be the source of Petitioner's later symptoms.

suffering award on higher end of the applicable range for SIRVA cases involving one arthroscopic surgery. For example, *S.C.* and *Tumolo* are instructive, but involved more definitive gaps in treatment during the two years prior to and following surgery than were seen in Petitioner's case. *S.C.,* 2021 WL 2949763, at *4; *Tumolo,* 2020 WL 6279711, at *14-15.

However, I do not agree that Petitioner is entitled to an award similar to that usually provided in cases involving multiple surgeries, especially those cited by Petitioner which involved circumstances showing more severe pain levels for greater periods of time. *Elmakky*, 2021 WL 6285619, at *5-6; *Welch*, 2021 WL 1795205, at *1-2; *Pruitt*, 2021 WL 5292022, at *1-4; *McDorman,* 2021 WL 5504698, at *2-3; *M.W.*, 2021 WL 3618177, at *2-4. No doubt Petitioner was frustrated by some continuing symptoms, but his SIRVA-related symptoms had primarily resolved within two years. I thus find that $170,000.00 represents an appropriate past pain and suffering award.

## VI. Compensation for Unreimbursed Expenses

Although I have determined that Petitioner did not experience a complete resolution of all SIRVA-related symptoms in August 2018, as Respondent maintains, I also have found he has not sufficiently connected most of his symptoms thereafter to his SIRVA. Thus, Respondent's proposed timeframe for the reimbursement of expenses in this case, is logical.

Additionally, Petitioner has attributed most of the expenses for which Respondent was unable to find sufficient documentation to the payment of a portion of his medical insurance deductible. However, he has failed to show out-of-pocket payment for these amounts. Thus, I find that the amount proposed by Respondent ($5,416.58) is appropriate.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $170,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[22] I also find that Petitioner is entitled to $5,416.58 in actual unreimbursable expenses.**

---

[22] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

16

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $175,416.58 to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[23]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[23] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.